IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL ANTHONY ROBERTS,

Defendant.

Case No.: 3:23-cr-00057-TMB-KFR-1

**ORDER ON MOTION TO DISMISS
(DKT. 29)**

This matter comes before the Court on Defendant Michael Anthony Roberts' Motion to Dismiss Count 1 of the Indictment (the "Motion").[1] The Government filed a response in opposition to Roberts' Motion.[2] The parties did not request oral argument. For the following reasons, the Motion is **DENIED**.

## I.    BACKGROUND

In June 2023, Roberts was indicted by a grand jury on charges of Felon in Possession of Firearms and Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (Count 1).[3] The Indictment alleges that on or about May 3, 2023, Roberts knowingly possessed a Savage 24V Series B 20 gauge/30-30 caliber combination rifle and a Ruger AR-556 rifle, eight rounds of 30-30 caliber ammunition, and five rounds of 20 gauge ammunition.[4] The Indictment further alleges that Roberts possessed these two firearms and ammunition while knowing he had been previously

---

[1] Dkt. 29 (Motion to Dismiss).
[2] Dkt. 40 (Government Response in Opposition).
[3] Dkt. 2 (Indictment).
[4] *Id.* at 1–2.

1

convicted of Criminal Mischief in the Third Degree, a Class C felony property offense punishable by imprisonment for a term exceeding one year.[5] Roberts was therefore barred from possessing firearms pursuant to §§ 922(g)(1) and 924(a)(8), which prohibit individuals from possessing a firearm who "ha[ve] been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year."[6]

In September 2023, Roberts moved to dismiss Count 1 of the Indictment[7] pursuant to *New York State Rifle & Pistol Association, Inc. v. Bruen*.[8] In the Motion, Roberts argues that § 922(g)(1)'s prohibition on possession of firearms by individuals convicted of a crime punishable by imprisonment exceeding one year violates the Second Amendment as applied to his conduct.[9] Roberts first contends that he "may claim a protected Second Amendment right" to possess firearms despite having a prior felony conviction punishable by more than one year, and that his "possession of a firearm outside his home for purposes of self-defense" is "plainly covered by the scope of the Second Amendment."[10] Roberts further argues that there is "no American historical tradition" prohibiting possession of firearms by persons convicted of crimes punishable by more than one year.[11] Thus, Roberts asserts, § 922(g)(1) is unconstitutional as applied to his conduct and the Indictment should be dismissed.[12]

---

[5] *Id.*

[6] 18 U.S.C. § 922(g)(1) ("It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."); § 924(a)(8) ("Whoever knowingly violates subsection (d) or (g) of section 922 shall be fined under this title, imprisoned for not more than 15 years, or both.").

[7] Dkt. 29.

[8] 597 U.S. __,142 S. Ct. 2111 (2022).

[9] Dkt. 29 at 2.

[10] *Id.* at 16.

[11] *Id.* at 17.

[12] *Id.* at 2.

The Government opposes the Motion, contesting each of Robert's arguments.[13] First, the Government argues that the Second Amendment right to possess firearms extends only to "law-abiding, responsible" citizens keeping or bearing arms for "lawful purposes."[14] As individuals who have been convicted of a felony are "neither law-abiding [nor] responsible," the Government contends, they are "not guaranteed the right to possess firearms under the Second Amendment."[15] Second, the Government argues that even if the Second Amendment's plain text does protect Roberts' right to possess firearms, § 922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation."[16] The Government stakes its reasoning in purported historical analogues to § 922(g)(1), including laws that disarmed groups of people who "were determined to pose a greater danger to the public or otherwise defied the rule of law."[17] These analogues included regulations disarming: (1) Catholics; (2) individuals who refused to swear allegiance to nascent state governments; (3) felons and the mentally ill; and (4) and those historically "deemed to be dangerous or untrustworthy," such as enslaved people, freed Black people, and Native Americans.[18] Thus, according to the Government, § 922(g)(1) is constitutional as applied to Roberts.[19]

---

[13] Dkt. 40.
[14] *Id.* at 8.
[15] *Id.* at 9.
[16] *Id.* at 10 (quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __,142 S. Ct. 2111, 2126 (2022)).
[17] *Id.* at 14.
[18] *Id.* at 3, 13–19.
[19] *Id.* at 21.

## II.    LEGAL STANDARDS

### A.  Motion to Dismiss

Under Fed. R. Crim. P. Rule 12(b), "[a] party may raise by pretrial motion any defense, objection, or request by pretrial motion that the [C]ourt can determine without a trial on the merits."[20] The Court must decide every pretrial motion before trial unless it finds good cause to defer and deferment will not adversely affect a party's right to appeal.[21] If the Court grants a motion to dismiss, it may order the defendant to be released or detained under 18 U.S.C. § 3142 until a new indictment or information is filed.[22]

### B.  As-Applied Constitutional Challenges

"[A]n indictment sought under a statute that is unconstitutional on its face or as applied will . . . be dismissed."[23] "Facial and as-applied challenges differ in the extent to which the invalidity of a statute need be demonstrated."[24] As-applied attacks challenge a set of rules in a statute, a subset of the statute's applications, or application of the statute to a specific set of facts.[25] A "statute may be invalid as applied to one state of facts and yet valid as applied to another."[26] An as-applied challenge is the proper vehicle to challenge a statute if a "claimed statutory defect applies to a sub-category of the people affected by the law."[27] Thus, for as-applied challenges, the

---

[20] Fed. R. Crim. P. 12(b)(1).
[21] Fed. R. Crim. P. 12(d); *see* Fed. R. Crim. P. 47.
[22] Fed. R. Crim. P. 12(g).
[23] *United States v. Mayer*, 503 F.3d 740, 747 (9th Cir. 2007).
[24] *Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir. 2013).
[25] *Id.*
[26] *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006).
[27] *Isaacson*, 716 F.3d at 1231; *see Gonzales v. Carhart*, 550 U.S. 124, 167–68 (2007) (finding that as-applied challenge was proper vehicle to seek relief for small subgroup of women affected by absence of medical exception in federal abortion law).

4

petitioner must demonstrate "partial . . . invalidation," such that a "statute may . . . be declared invalid to the extent that it reaches too far, but otherwise [is] left intact."[28]

C. New York State Rifle & Pistol Association, Inc. v. Bruen

In *New York State Rifle & Pistol Association, Inc. v. Bruen*,[29] the U.S. Supreme Court established a new test to determine whether a firearm regulation comports with the Second Amendment.[30] The *Bruen* framework "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."[31] First, courts must ask whether "the Second Amendment's plain text covers an individual's conduct."[32] If it does not, then the "regulated activity is categorically unprotected"; the regulation is valid and "the analysis can stop there."[33] But if the Second Amendment's text covers the conduct at issue, the conduct is "presumptively protect[ed]."[34] Then, courts must ask whether the government has met its burden to "justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation."[35] If a firearm regulation is consistent with historical tradition, "[o]nly then may a court conclude that the individual's conduct falls outside the Second Amendment's [protection]" and the regulation is constitutionally valid.[36]

---

[28] *Ayotte*, 546 U.S. at 329.
[29] 597 U.S. __,142 S. Ct. 2111 (2022).
[30] *Id.*
[31] *Id.* at 2131.
[32] *Id.* at 2126.
[33] *Id.* (quoting *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012)).
[34] *Id.* at 2130.
[35] *Id.*
[36] *Id.*

# III. DISCUSSION

Having reviewed the parties' briefing and Second Amendment jurisprudence, the Court concludes that § 922(g)(1) is not unconstitutional as applied to Roberts. Therefore, for the following reasons, the Motion is denied.

## A. *The Supreme Court and the Ninth Circuit Have Consistently Upheld Felon Disarmament Statutes*

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed."[37] This right is "not unlimited" and remains "subject to certain reasonable, well-defined restrictions."[38] One such restriction is the "longstanding prohibition[] on the possession of firearms by felons."[39] In *District of Columbia v. Heller*,[40] the Supreme Court considered the constitutionality of a Washington, D.C. ban on handgun possession within the home for the purposes of self-defense.[41] While the Court held the total ban unconstitutional under the Second Amendment,[42] it emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill,"[43] which the Court considered "presumptively lawful."[44]

---

[37] U.S. CONST. amend. II.
[38] *Bruen*, 142 S. Ct. at 2156 (citing *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008)).
[39] *Heller*, 554 U.S. at 626.
[40] 554 U.S. 570 (2008).
[41] *Id.* at 628.
[42] *Id.* at 635.
[43] *Id.* at 626.
[44] *Id.* at 627 n.26; *see id.* at 635 ("*Assuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home." (emphasis added)).

In *McDonald v. City of Chicago*,[45] the Supreme Court held that this Second Amendment right to possess firearms for self-defense also extended to the States under the Fourteenth Amendment's Due Process Clause.[46] Affirming *Heller*, the Court clarified that its present holding "did not cast doubt on longstanding regulatory measures" such as the "prohibitions on the possession of firearms by felons."[47] Thus, before *Bruen*, the Supreme Court had consistently upheld the constitutionality of federal felon disarmament statutes under the Second Amendment.[48]

The Ninth Circuit has followed *Heller* and *McDonald* in recognizing the facial and as-applied constitutionality of felon disarmament statutes. In *United States v. Vongxay*,[49] the Ninth Circuit held that § 922(g)(1) was facially constitutional under the Second Amendment.[50] The Circuit drew a distinction between a "'virtuous citizen[ry]' that would protect society through defensive use of arms *against criminals*" and "unvirtuous citizens (i.e. *criminals*)," whose Second Amendment rights were limited and subject to disarmament laws.[51] Noting that "felons are categorically different from the individuals who have a fundamental right to bear arms,"[52] the Circuit held that § 922(g)(1) was a "limited and narrowly tailored exception to the freedom to possess firearms, reasonable in its purposes and consistent with the right to bear arms protected

---

[45] 561 U.S. 742 (2010).

[46] *Id.* at 791.

[47] *Id.* at 786; *see id.* ("We repeat [*Heller*'s] assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.").

[48] *See Caron v. United States*, 524 U.S. 308, 309 (1998) (recognizing and applying 18 U.S.C. § 922(g)(1) and accompanying sentence enhancement provisions); *Taylor v. United States*, 495 U.S. 575, 578 (1990) (same); *Lewis v. United States*, 445 U.S. 55, 64 (1980) (recognizing that § 922(g)(1) applies not only to validly convicted felons but also to persons under felony indictment).

[49] 594 F.3d 1111 (9th Cir. 2010).

[50] *Id.* at 1118.

[51] *Id.* (emphasis added).

[52] *Id.* at 1115.

under the Second Amendment."[53] The Circuit considered its holding consistent with *Heller*, stating that "nothing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)" or the "longstanding prohibitions on the possession of firearms by felons and the mentally ill."[54]

Other Ninth Circuit cases followed *Heller*, *McDonald*, and *Vongxay* in holding that § 922(g)(1) comports with the Second Amendment. In *United States v. Torres*,[55] the Circuit recognized that it was "bound under *Vongxay* and *Heller* to assume the propriety of felon firearm bans."[56] Similarly, in *United States v. Phillips*,[57] the Ninth Circuit found that it "must" accept the presumed constitutionality of felon disarmament statutes under Supreme Court and Ninth Circuit precedent, and held that a non-violent misprision of felony conviction could serve as the basis for a felon firearm ban under § 922(g)(1).[58] A majority of Circuit Courts similarly have affirmed the constitutionality of § 922(g)(1) under the Second Amendment.[59] Thus, Supreme Court and Circuit Court precedent affirms the constitutionality of § 922(g)(1).

---

[53] *Id.* at 1117 (quoting *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004)).

[54] *Id.* at 1114.

[55] 789 F. App'x 655 (9th Cir. 2020).

[56] *Id.* at 657.

[57] 827 F.3d 1171 (9th Cir. 2016).

[58] *Id.* at 1175; *see also Van Der Hule v. Holder*, 759 F.3d 1043, 1051 (9th Cir. 2014) (noting that § 922(g)(1) "continues to pass constitutional muster").

[59] *See, e.g.*, *United States v. Bogle*, 717 F.3d 281, 282 (2d Cir. 2013) (collecting cases affirming the constitutionality of § 922(g)(1)); *United States v. Moore*, 666 F.3d 313, 318–19 (4th Cir. 2012); *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 693–94 (7th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009).

B.  Bruen *Did Not Repudiate the Constitutionality of Federal Felon Disarmament Statutes*

In *New York State Rifle & Pistol Association v. Bruen*,[60] the Supreme Court established a new test for assessing the constitutionality of gun regulations. Rejecting the previous means-end, intermediate scrutiny approach, the Court adopted the following standard for applying the Second Amendment to modern firearms prohibitions:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[61]

This test requires courts to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."[62] To determine whether a regulation violates the Second Amendment, lower courts must consider the following: (1) the lack of a "distinctly similar historical regulation addressing" a "general societal problem" that has existed since the 18th century; (2) historical attempts to address the problem but through "materially different means"; and (3) rejection of or failure to enact "analogous regulations" to control this problem based on constitutional grounds.[63]

Roberts argues that *Bruen*'s framework "supersede[s]" *Heller*'s text affirming the constitutionality of felon disarmament and other class-based disarmament regulations.[64] First, Roberts argues that *Bruen* effectively "abrogated prior case law relying on 'presumptively lawful' exceptions to the Second Amendment."[65] Second, Roberts argues that the Second Amendment

---

[60] 597 U.S. __,142 S. Ct. 2111 (2022).
[61] *Id.* at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).
[62] *Id.* at 2131.
[63] *Id.*
[64] Dkt. 29 at 8, 15.
[65] *Id.* at 9.

9

right to keep and bear arms is "not limited to 'law-abiding, responsible citizens.'"[66] We address each of Roberts' claims in turn.

1. <u>*Bruen* Did Not Abrogate Prior Supreme Court and Ninth Circuit Case Law Relying on "Presumptively Lawful" Exceptions to the Second Amendment.</u>

Roberts argues that *Bruen* "repudiated any reliance on *Heller*'s list of 'presumptively lawful' exceptions to uphold disarmament statutes" and is "clearly irreconcilable with prior precedent holding that *Heller*'s list . . . automatically controls."[67] But the *Bruen* court did not repudiate—and indeed preserved—*Heller*'s list of "presumptively lawful" firearm regulations.[68] While *Bruen* changed how courts must assess the constitutionality of firearm regulations, it did not disturb prior courts' understanding that the Second Amendment "is not unlimited" and "allows a 'variety' of gun regulations."[69] The majority opinion recognized the continuing validity of "'longstanding' laws forbidding the carrying of firearms," including those enumerated in *Heller*.[70] The Court clarified its new framework for "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check," and that certain regulations may continue to survive Second Amendment muster.[71] Though the Court rejected the commonly used "two-step" approach for analyzing Second Amendment challenges, it confirmed that its holding was soundly "in keeping with *Heller*."[72]

In their concurring opinions, Justices Kavanaugh and Alito agreed with the majority opinion and endorsed *Heller* and *McDonald*'s continuing authority. Justice Kavanaugh, joined by

---

[66] *Id.* at 13.
[67] *Id.* at 11.
[68] *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).
[69] *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008)); *ante*, at 2133.
[70] *Id.* at 2133 (affirming *Heller*'s discussion of the validity of prohibitions on carrying firearms in sensitive places such as schools and government buildings).
[71] *Id.*
[72] *Id.* at 2126.

10

Chief Justice Roberts, noted that *Heller* and *McDonald* did not foreclose the constitutionality of certain firearm prohibitions.[73] Quoting Justice Scalia in *Heller*, Justice Kavanaugh confirmed that "nothing in [*Bruen*] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and that such prohibitions are "presumptively lawful regulatory measures."[74] In his concurrence, Justice Alito further confirmed that the Court's holding did not "disturb[] anything that [it] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns."[75]

In his dissent, Justice Breyer, joined by Justices Sotomayor and Kagan, also recognized the continuing validity of *Heller*'s "presumptively lawful" regulations.[76] Justice Breyer noted that under *Heller*, the Second Amendment "was not without limits and could appropriately be subject to government regulation," such as the prohibition on the possession of firearms by felons and the mentally ill.[77] Justice Breyer agreed with the majority and concurring opinions that *Bruen* did not disturb *Heller*'s identification of "presumptively lawful" firearm prohibitions,[78] and agreed with Justice Kavanaugh in "understand[ing] the Court's opinion . . . to cast no doubt on that aspect of *Heller*'s holding."[79] Rather than "abrogat[ing]" prior case law relying on *Heller*'s "presumptively lawful" Second Amendment regulations, the *Bruen* court appeared to preserve such prohibitions.

Roberts further argues that because *United States v. Vongxay* "relied on a line of cases upholding felon disarmament laws under means-end scrutiny," an analysis *Bruen* abolished,

---

[73] *Id.* at 2162 ("[A]s *Heller* and *McDonald* established and the Court today again explains, the Second Amendment 'is neither a regulatory straightjacket nor a regulatory blank check.'" (quoting *ante*, at 2133)).

[74] *Id.* at 2162 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008)).

[75] *Id.* at 2157 (Alito, J., concurring) (internal citations omitted).

[76] *Id.* at 2189 (Breyer, J., dissenting).

[77] *Id.* at 2189–90.

[78] *Id.*

[79] *Id.* at 2189.

"*Vongxay* is therefore no longer good law."[80] However, the *Bruen* court maintained that its holding was "in keeping with *Heller*,"[81] and Justice Alito insisted the Court's decision did not "disturb[] anything that [it] said in *Heller* . . . about restrictions that may be imposed on the possession or carrying of guns," including "presumptively lawful" felon disarmament laws.[82]

Moreover, *Bruen* does not discuss *Vongxay*, and as the Government noted, neither the Supreme Court nor the Ninth Circuit has overturned it.[83] Ninth Circuit precedent is only "effectively overruled" when "the reasoning or theory of our prior circuit authority is *clearly irreconcilable* with the reasoning or theory of intervening higher authority."[84] "The clearly irreconcilable requirement is a high standard. . . . [I]t is not enough for there to be some tension between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to cast doubt on the prior circuit precedent."[85] Rather, if the Court "can apply . . . prior circuit precedent without running afoul of the intervening authority it must do so."[86] Given the *Bruen* court's careful intent to preserve *Heller*, its holding is not "clearly irreconcilable" with

---

[80] Dkt. 29 at 10.

[81] *Bruen*, 142 S. Ct. at 2126.

[82] *Id.* at 2157 (Alito, J., concurring); *see United States v. Butts*, 637 F. Supp. 3d 1134, 1137 (D. Mont. 2022) (finding that "because *Bruen* does not disturb the felon dispossession component of *Heller*, it does not render 922(g)(1) unconstitutional"); *United States v. Siddoway*, No. 1:21-CR-00205-BLW, 2022 WL 4482739, at *1 (D. Idaho Sept. 27, 2022) (noting that "[a]t least five justices indicated their explicit intent" in *Bruen* not to overrule *Heller* and *Heller*-reliant cases); *United States v. Hill*, 629 F. Supp. 3d 1027, 1030 (S.D. Cal. 2022) (observing that "the reasoning of *Vongxay* and *Heller*—on which *Vongxay* relies—are not 'clearly irreconcilable with the reasoning or theory' of *Bruen*" and that the court was subsequently "bound by *Vongxay* and its progeny" (quoting *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003))).

[83] Dkt. 40 at 7.

[84] *Miller v. Gammie*, 335 F.3d 889, 890, 893 (9th Cir. 2003) (en banc) (emphasis added).

[85] *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) (quoting *United States v. Robertson*, 875 F.3d 1281, 1291 (9th Cir. 2017)).

[86] *Id.*

*Heller* or pre-*Bruen* Ninth Circuit cases that have relied on its "presumptively lawful" language to uphold the constitutionality of felon disarmament laws.[87]

Since *Bruen*, every district court within the Ninth Circuit has similarly upheld the constitutionality of § 922(g)(1).[88] While the Ninth Circuit has yet to weigh in, of those circuits that have directly decided the issue, the Fifth, Seventh, Eighth, and Tenth Circuits also have upheld § 922(g)(1).[89]

---

[87] *See Siddoway*, 2022 WL 4482739, at *2 (noting that the Ninth Circuit's reasoning in *Vongxay* is "consistent" with *Bruen*'s history and tradition test, and that any "limited tension" between the cases is insufficient to find *Vongxay* "effectively overruled"); *U.S.A. v. Nevens*, No. CR 19-774-DMG, 2022 WL 17492196, at *2 (C.D. Cal. Aug. 15, 2022) (holding that *Bruen* did not overrule *Vongxay* and other established Ninth Circuit precedent, and that the Court was bound by its "obligation to construe Ninth Circuit opinions in a manner consistent with Supreme Court precedent"); *United States v. Padgett*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 3483929, at *4 (D. Alaska Jan. 4, 2023), *report and recommendation adopted*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 2986935 (D. Alaska Apr. 18, 2023) (noting that "*Bruen* did not effectively overrule *Heller* and post-*Heller* precedent" and that district courts upholding § 922(g)(1) have "relied heavily on the Ninth Circuit's examination . . . of historical gun regulations," which is "not clearly irreconcilable with the reasoning or theory of *Bruen*").

[88] *See, e.g.*, *United States v. Gamble*, No. 2:22-CR-00267-JAD-EJY, 2023 WL 6460665 (D. Nev. Oct. 4, 2023); *United States v. Chatman*, No. 14-CR-00552-CRB-1, 2023 WL 3509699 (N.D. Cal. May 16, 2023); *United States v. Guthery*, No. 2:22-CR-00173-KJM, 2023 WL 2696824 (E.D. Cal. Mar. 29, 2023); *United States v. Jackson*, No. CR22-37RSL, 2023 WL 1967199 (W.D. Wash. Feb. 13, 2023); *United States v. Moore*, No. 3:20-CR-00474-IM-1, 2023 WL 154588 (D. Or. Jan. 11, 2023); *United States v. Jackson*, No CR 22-1969-TUC-JGZ(JR), 2022 WL 18956628 (D. Ariz. Dec. 9, 2022), *report and recommendation adopted*, No. CR 22-1969-TUC-JGZ(JR), 2023 WL 1965424 (D. Ariz. Feb. 13, 2023); *United States v. Hill*, 629 F.Supp.3d 1027 (S.D. Cal. 2022); *United States v. Siddoway*, No. 1:21-CR-00205-BLW, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); *U.S.A. v. Nevens*, No. CR 19-774-DMG, 2022 WL 17492196 (C.D. Cal. Aug. 15, 2022); *United States v. Butts*, 637 F. Supp. 3d 1134 (D. Mont. 2022); *United States v. Delpriore*, 634 F.Supp.3d 654 (D. Alaska 2022).

[89] *See United States v. Smith*, No. 22-10795, 2023 WL 5814936, at *3 (5th Cir. Sept. 8, 2023) (finding no plain error where the district court upheld § 922(g)(1) as applied to defendant, "given the lack of binding authority deeming § 922(g)(1) unconstitutional"); *United States v. Hill*, No. 22-2400, 2023 WL 2810289, at *2 (7th Cir. Apr. 6, 2023) (affirming the district court's finding that § 922(g)(1) is not "plainly unconstitutional" and that "[b]ecause the law is unsettled, any error, if there was one, would not be plain"); *United States v. Jackson*, 69 F.4th 495, 501 (8th Cir. 2023) (affirming the district court's finding that § 922(g)(1) was not unconstitutional as applied to a defendant with "non-violent" drug offenses); *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir.

Notably, only one appellate court—the Third Circuit—recently found § 922(g)(1) unconstitutional as applied to the particular defendant in that case.[90] In *Range v. Attorney General United States of America*,[91] the Third Circuit held that the felon disarmament statute did not deprive a felon convicted of making a false statement to obtain food stamps of his Second Amendment right.[92] However, the Court limited its holding, describing it as "narrow" and one that "challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to [the defendant] given his violation of [the applicable state law]."[93]

But *Range* is readily distinguishable on the facts. In that case, the defendant was convicted of a "nonviolent, non-dangerous misdemeanor"—understating his income on a food stamp application—and was not incarcerated, instead serving three years' probation and paying restitution, costs, and a fine.[94] Here, Roberts' conviction involved Criminal Mischief in the Third Degree, a Class C felony property crime,[95] for which he was sentenced to two-and-a-half years' imprisonment.[96] In his concurring opinion in *Range*, Circuit Judge Ambro, joined by Circuit

---

2023) (affirming the district court's finding that § 922(g)(1) is constitutional for "*any* convicted felon's possession of a firearm").

[90] *See Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023).

[91] 69 F.4th 96 (3d Cir. 2023).

[92] *Id.* at 106.

[93] *Id.*

[94] *Id.* at 98–99.

[95] ALASKA STAT. 11.46.482 (Criminal Mischief in the Third Degree) ("A person commits the crime of criminal mischief in the third degree if, having no right to do so or any reasonable ground to believe the person has such a right, (1) with intent to damage property of another, the person damages property of another in an amount of $750 or more; (2) the person recklessly creates a risk of damage in an amount exceeding $100,000 to property of another by the use of widely dangerous means; or (3) the person knowingly (A) defaces, damages, or desecrates a cemetery or the contents of a cemetery or a tomb, grave, or memorial regardless of whether the tomb, grave, or memorial is in a cemetery or whether the cemetery, tomb, grave, or memorial appears to be abandoned, lost, or neglected; (B) removes human remains or associated burial artifacts from a cemetery, tomb, grave, or memorial regardless of whether the cemetery, tomb, grave, or memorial appears to be abandoned, lost, or neglected.").

[96] *See* Dkt. 4 (Sealed Pretrial Services Report) at 12.

Judges Greenaway, Jr., and Montgomery-Reeves, distinguished Range's conduct from more serious criminal behavior, acknowledging that "arming those who pose a threat to the orderly functioning of society . . . would be a dangerous precedent."[97] Thus, *Range*'s constitutional analysis of § 922(g)(1) as applied to a nonviolent, non-dangerous misdemeanant who was not sentenced imprisonment has limited application to Roberts, who committed a third-degree felony property crime and was subsequently incarcerated.[98]

The *Range* court further observed that § 922(g)(1) was unconstitutional as applied to Range because under a *Bruen* analysis, "the Government ha[d] not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms."[99] While this means the *Range* court found the Government did not carry its burden in this case, it does not foreclose the presentation of persuasive evidence in another case assessing the constitutionality of § 922(g)(1). Moreover, this case remains an outlier among appellate courts, and both appellate and district courts have declined to follow it.[100] Further, the Third Circuit wields no precedential

---

[97] *Range*, 69 F.4th at 113 (J. Ambro, concurring).

[98] *See United States v. Harrison*, No. 3:22-CR-455, 2023 WL 4670957, at *8 (N.D.N.Y. July 20, 2023) (comparing Range, "the food stamp fraudster who pleaded guilty to an unusual state law misdemeanor," to the defendant, whose "prior misconduct involve[d] an actual federal felony: his . . . federal drug conviction").

[99] *Range*, 69 F.4th at 106.

[100] *See United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023) (declining to follow *Range* and upholding § 922(g)(1) as applied to all convicted felons); *United States v. Warren*, No. 22-CR-231(DLI), 2023 WL 5978029, at *6 (E.D.N.Y. Sept. 14, 2023) (noting that *Range* "goes against the weight of the authority analyzing § 922(g)(1)'s constitutionality in *Bruen*'s wake"); *United States v. Harrison*, No. 3:22-CR-455, 2023 WL 4670957, at *8 (N.D.N.Y. July 20, 2023) (noting that "the list of post-*Bruen* precedent that is actually favorable to defendant's Second Amendment text-and-history argument basically begins and ends with the *en banc* opinion in *Range*").

authority over district courts in the Ninth Circuit, and this Court remains bound by Ninth Circuit precedent upholding the constitutionality of § 922(g)(1).[101]

2. The District of Alaska Has Consistently Upheld the Constitutionality of § 922(g)(1).

Like every other district court in the Ninth Circuit to have decided the issue, the District of Alaska has consistently upheld the constitutionality of § 922(g)(1). In *United States v. Delpriore*,[102] a defendant was convicted of violating § 922(g)(1) for possessing firearms knowing he had been previously convicted of Misconduct Involving a Controlled Substance in the Third Degree, a state crime carrying a term of imprisonment exceeding one year.[103] Given the "Supreme Court's previous emphasis on the validity of prohibitions on the possession of firearms by felons continues after *Bruen*," the district court reasoned that the Supreme Court would uphold the facial constitutionality of § 922(g)(1) under the *Bruen* framework.[104] Since *Delpriore*, every decision within the District of Alaska also has upheld § 922(g)(1).[105] Although district court opinions "do

---

[101] *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc); *United States v. Barber*, No. 3:22-CR-00065-SLG-MMS, 2023 WL 4157177, at *1 (D. Alaska June 23, 2023) ("The Court notes that the Third Circuit's decision in *Range* is narrow and not controlling in this Circuit.").

[102] 634 F. Supp. 3d 654, 656 (D. Alaska 2022).

[103] *Id.* at 655; Dkt. 380 (Judgment).

[104] *Id.* at 658.

[105] *See United States v. Filoial II*, No. 3:21-CR-00052-JMK, 2023 WL 5832153, at *1 (D. Alaska Sept. 8, 2023) ("First, the Court concurs that *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) remains binding precedent upon the Court. Second, the Court has previously recognized historical analogues that support a consistent application of 18 U.S.C. § 922 with the Second Amendment. Lastly, the Court shall remain consistent with other district courts within the Circuit in its constitutional interpretation of 18 U.S.C. § 922(g)(1)."); *United States v. Owens*, No. 3:23-CR-00026-SLG-KFR, 2023 WL 5291341 (D. Alaska Aug. 17, 2023) (observing that § 922(g)(1) "remains valid post-*Bruen* and in light of Ninth Circuit precedent"); *United States v. Barber*, No. 3:22-CR-00065-SLG-MMS, 2023 WL 4157177 (D. Alaska June 23, 2023) (denying a motion to reconsider under *Range v. Att'y Gen. United States*, and upholding § 922(g)(1)); *United States v. Cleveland-McMichael*, No. 3:21-CR-00119-SLG, 2023 WL 2613548 (D. Alaska Mar. 23, 2023) ("Because 18 U.S.C. § 922(g)(1) criminalizes the possession of firearms by felons, this Court determines that the statute would be upheld by the Supreme Court using the interpretation method pronounced in *Bruen*."); *United States v. Carleson*, No. 3:22-CR-00032-SLG, 2022 WL 17490753, at *3 (D. Alaska Oct. 28, 2022) (upholding § 922(g)(1) post-*Bruen*); *see also United*

16

not bind other district courts within the same district," they "are relevant for their persuasive authority."[106] "It should go without saying that courts may rely on persuasive but nonbinding authority so long as it is in line with the rules that do bind them."[107] As such, this Court may rely on the persuasive authority of prior decisions within the District of Alaska that have upheld the constitutionality of § 922(g)(1).

3.  Neither *Heller* Nor *Bruen* Determined the Scope of Second Amendment Protections.

Roberts argues that because felons "are not categorically excluded from our national community," he is among "the people" covered by Second Amendment protections."[108] Roberts posits that neither *Heller* nor *Bruen* limited the Second Amendment's scope to "law-abiding, responsible citizens," and that such references were "meant to establish a floor, not a ceiling."[109]

The Court declines to adopt Roberts' reasoning. Roberts is correct that neither *Heller* nor *Bruen* explicitly addressed whether and to what extent an individual's criminal history is relevant to the scope of Second Amendment rights. However, Roberts uses this ambiguity to argue that he is entitled to such protections though he is an individual convicted of a criminal mischief felony. Neither *Heller* nor *Bruen* directly reaches this issue. Additionally, Roberts' argument overlooks

---

*States v. Ryno*, No. 3:22-CR-00045-JMK, 2023 WL 3736420, at *9 (D. Alaska May 31, 2023) (noting that "a chorus of district courts have upheld § 922(g)(1)").

[106] *City of Fresno v. United States*, 709 F. Supp. 2d 888, 909 (E.D. Cal. 2010).

[107] *United States v. Garcia*, No. 2:21-CR-00224-CDS-VCF-1, 2023 WL 1110567, at *3 (D. Nev. Jan. 30, 2023) (quoting *JW Gaming Dev., LLC v. James*, 544 F. Supp. 3d 903, 926 n.13 (N.D. Cal. 2021)).

[108] Dkt. 29 at 14.

[109] *Id.* at 15; *see id.* (arguing the *Bruen* court "held that, *at the very least*, [law-abiding] people are protected by the Second Amendment" and that it likely protects other populations as well (emphasis in original)).

17

the repeated references in both *Heller* and *Bruen* to "law-abiding" citizens in describing the scope of Second Amendment protections.[110]

In *Heller*, the Court struck down a D.C. law banning the use of handguns in the home.[111] However, the Court clarified that this Second Amendment right extended to "law-abiding, responsible citizens,"[112] and that "nothing in [the Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."[113] Further, the Court reasoned that this Second Amendment right only extended to Heller insofar as he was otherwise "not disqualified from the exercise of Second Amendment rights."[114] The Court accepted the petitioners' argument that if the handgun ban was found unconstitutional, Heller could still be disqualified from obtaining a license if he was found to be a "felon" or "insane."[115] While Roberts may be correct that the *Heller* court did not fully address how an individual's criminal history may impact their Second Amendment rights, this Court must give meaning to *Heller*'s specific references to a "law-abiding, responsible citizen[ry]" in defining the scope of its holding.[116]

Extending *Heller*, the *Bruen* court held that the Second Amendment protects an individual's right to carry a handgun publicly for self-defense.[117] Yet, like *Heller*, the Court

---

[110] *See District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (reasoning that the Second Amendment "elevate[d] above all other interests the right of *law-abiding, responsible* citizens to use arms in defense of hearth and home" (emphasis added)); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111, 2156 (2022) (striking down New York's proper-cause requirement because it "prevent[ed] *law-abiding* citizens with ordinary self-defense needs from exercising their right to keep and bear arms" (emphasis added)).
[111] *Heller*, 554 U.S. at 636.
[112] *Id.* at 635.
[113] *Id.* at 626.
[114] *Id.* at 635.
[115] *Id.* at 631.
[116] *Id.* at 635.
[117] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111, 2156 (2022).

unambiguously applied its holding to "ordinary, law-abiding citizens."[118] The Court clarified that *Heller* and *McDonald* "recognized . . . the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense,"[119] and that the "right of law-abiding, responsible citizens to use arms" for self-defense "demands . . . unqualified deference."[120] Notably, the Court highlighted the "law-abiding" nature of the petitioners—"two ordinary, law-abiding, adult citizens"—in designating them "part of 'the people'" the Second Amendment was designed to protect.[121] Thus, "[t]he focus in *Bruen* was on 'regulations impacting law-abiding citizens.' To the *Bruen* court, those 'law-abiding citizens' were the individuals—'the people'—who held a Second Amendment right to possess firearms."[122]

Further, applying its history and tradition test, the *Bruen* court found that none of the historical limitations put forth by the Government "operated to prevent *law-abiding* citizens with ordinary self-defense needs from carrying arms in public for that purpose."[123] As such, New York's handgun law violated the Second Amendment because it "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."[124] Contrary to Roberts' argument, *Bruen*'s consistent references to "law-abiding citizens," together with its

---

[118] *Id.* at 2122 ("In this case, petitioners and respondents agree that *ordinary, law-abiding* citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." (emphasis added)).

[119] *Id.* at 2122.

[120] *Id.* at 2131.

[121] *Id.* at 2134.

[122] *United States v. Padgett*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 3483929, at *5 (D. Alaska Jan. 4, 2023), *report and recommendation adopted*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 2986935 (D. Alaska Apr. 18, 2023) (quoting *United States v. Nutter*, 624 F. Supp. 3d 636, 641 (S.D. W. Va. 2022)).

[123] *Bruen*, 142 S. Ct. at 2150 (emphasis added).

[124] *Id.* at 2156.

careful preservation of *Heller* and its "presumptively lawful" felon disarmament regulations, seem to exclude, rather than include, non-law-abiding individuals from the scope of its holding.[125]

Alternatively, Roberts casts *Bruen*'s references to "law-abiding persons" as "dicta" upon which the Government cannot rely in satisfying *Bruen*'s history and tradition test.[126] This Court disagrees. *Bruen*'s references to a "law-abiding" citizenry are not dicta, but rather the Court "limit[ing] the scope of [its] holding[]."[127] "[S]uch limitations are integral to [courts'] holdings."[128] Given the *Heller* and *Bruen* courts' ambiguity in defining the scope of Second Amendment rights, the Court sees some basis for Roberts' argument that the Second Amendment is not limited to

---

[125] *See also United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) . . . .'" (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS. 143, 146 (1986))); *United States v. Ingram*, No. 18-557, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022) ("By distinguishing non-law-abiding citizens from law-abiding ones, the dicta in *Heller* and *McDonald* clarifies the bounds of the plain text of the Second Amendment. This, coupled with the majority's focus in *Bruen* on the Second Amendment rights of 'law-abiding citizens' throughout the opinion, convinces this Court that the Supreme Court would conclude that [felon-in-possession and comparable statutes] fail to infringe on any Second Amendment rights.").

[126] Dkt. 29 at 15 ("If there was any ambiguity [about whether the Second Amendment applies to people with a criminal history], *Bruen* clarifies that [its language] does not delineate the scope of the Second Amendment. Although *Heller* reasoned that the Second Amendment protected the right of law-abiding persons to use arms in defense of 'hearth and home,' *Bruen* held that the Second Amendment's protections do extend outside the home. And the insistence throughout *Bruen* that the government bears the burden of proving any regulation as consistent with this Nation's historical traditions commands that the government prove its case not by dicta but by actual evidence.").

[127] *Vongxay*, 594 F.3d at 1115.

[128] *Id.* And, even if these references are dicta, "Supreme Court dicta commands deference and may not be lightly discarded." *United States v. Butts*, 637 F. Supp. 3d 1134, 1138 (D. Mont. 2022) (internal quotations omitted) (citing *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc)).

"law-abiding, responsible citizens."[129] However, in light of *Heller* and *Bruen*'s repeated references to a "law-abiding" citizenry, Roberts cannot argue that these cases affirmatively protected the Second Amendment rights of convicted felons. As Roberts observes, the *Heller* court "did not have occasion to address whether criminal history is relevant when construing the full scope of the protected right," and the *Bruen* court also "d[id] not delineate the scope of the Second Amendment."[130] Given these inconsistencies, the Court declines to rule on this aspect of Roberts' argument at this time.

### C. Section 922(g)(1) Is Not Unconstitutional as Applied to Roberts

Even if *Bruen* did not preserve *Heller*'s "presumptively lawful" felon disarmament regulations, § 922(g)(1) is not unconstitutional as applied to Roberts under a *Bruen* analysis. Under *Bruen*, the threshold question is whether an individual's conduct is protected by the plain text of the Second Amendment.[131] If it is, the individual's conduct is "presumptively" constitutional and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."[132] Roberts argues that under this analysis, § 922(g)(1) violates the Second Amendment as applied to him.[133] First, Roberts argues that his conduct is protected by the Second Amendment.[134] Second, Roberts argues that the Government failed to establish a historical tradition of "distinctly similar" firearm regulations.[135] We address each of Roberts' arguments in turn.

---

[129] *See United States v. Guthery*, No. 2:22-CR-00173-KJM, 2023 WL 2696824, at *4 (E.D. Cal. Mar. 29, 2023) (observing that the *Bruen* court "did not decide 'who may lawfully possess a firearm'").

[130] Dkt. 29 at 15.

[131] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111, 2126 (2022).

[132] *Id.* at 2126, 2130.

[133] Dkt. 29 at 2.

[134] *Id.* at 16.

[135] *Id.* at 17.

1. <u>The Court Presumes, Without Deciding, that the Second Amendment Protects Roberts'</u>
   <u>Conduct.</u>

Roberts argues that his conduct, "possession of a firearm outside his home for purposes of self-defense," is "plainly covered" by the scope of the Second Amendment under *Bruen*.[136] Thus, he "has standing to assert that application of 18 U.S.C. § 922(g)(1) violates his Second Amendment right to bear arms."[137] The Second Amendment states that "the right of the people to keep and bear Arms[] shall not be infringed,"[138] and the Supreme Court has clarified that the "individual right to possess and carry weapons . . . does not depend on service in the militia."[139] *Bruen* held that Second Amendment protections extend beyond the home for the purposes of self-defense.[140] Roberts was indicted for carrying firearms and ammunition outside his home, allegedly for the purposes of self-defense.[141] Thus, at first blush it seems that his conduct is, at least facially, covered by the plain text of the Second Amendment.

However, Roberts' conduct was not mere "possession of a firearm outside his home for purposes of self-defense," as he asserts.[142] His conduct involved the possession of firearms and ammunition "knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year."[143] Roberts' argument that he is a part of "the people" protected by the Second Amendment lies in direct tension with *Bruen*'s repeated references to "law-abiding

---

[136] *Id.* at 16.
[137] *Id.*
[138] U.S. CONST. amend. II.
[139] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111, 2127 (2022) (citing *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)).
[140] *Id.* at 2156.
[141] Dkt. 2; Dkt. 29 at 16.
[142] Dkt. 29 at 16.
[143] Dkt. 2.

citizens" and its explicit preservation of *Heller*'s holding.[144] There is an argument that felons—as people who are not "law-abiding"—are excluded from the Second Amendment's reach.[145] However, the Court ultimately presumes that Roberts' conduct is covered by the Second Amendment for two reasons: (1) the Ninth Circuit has not decided whether the Second Amendment extends to felons post-*Bruen*; and (2) the Government prevails in the second part of the *Bruen* inquiry.

Lower courts have adopted competing approaches to determine whether a particular individual's conduct falls within the plain text of the Second Amendment as a member of "the people."[146] One approach suggests there are "certain groups of people—for example, felons—who fall entirely outside the Second Amendment's scope."[147] This approach finds support in *Heller* and

---

[144] *Bruen*, 142 S. Ct. at 2156; *see United States v. Padgett*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 3483929, at *6 (D. Alaska Jan. 4, 2023), *report and recommendation adopted*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 2986935 (D. Alaska Apr. 18, 2023) (noting that "*Bruen* clearly does not undermine prior holdings that felons are not among 'the people' protected by the Second Amendment" because of its "careful attempts to clarify, reiterate, and keep with *Heller*," including "'the people' analysis that undergirds the *Heller* principles driving *Bruen*").

[145] This Court has reached similar conclusions in considering the as-applied constitutionality of other provisions of § 922(g). *See Padgett*, 2023 WL 3483929, at *6 ("There is a strong argument to be made based upon *Bruen*'s repeated references to 'law-abiding citizens' that the Second Amendment's exclusion from 'the people' includes those convicted of misdemeanors crimes of domestic violence [under § 922(g)(9)]."); *United States v. Endsley*, No. 3:21-cr-00058-TMB-MMS-1, at *5 (D. Alaska June 5, 2023), *report and recommendation adopted*, No. 3:21-CR-00058-TMB-MMS-1, 2023 WL 6476389 (D. Alaska Oct. 5, 2023) (upholding § 922(g)(3) under *Bruen*'s history and tradition test, but finding that the defendant was among "the people" protected by the Second Amendment because "the government has not proffered evidence of any past convictions, felonious or violent, that would potentially bar [the defendant] from being part of the Second Amendment's plain text. . . . There is, therefore, nothing in the record to indicate that [the defendant] has lost his right to vote, to serve on juries, or hold political office.").

[146] *See United States v. Padgett*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 2986935, at *5–7 (D. Alaska Apr. 18, 2023) (outlining two competing approaches adopted by lower courts to discern the scope of Second Amendment rights).

[147] *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (J. Barrett, dissenting), *abrogated by Bruen*, 142 S. Ct. 2111; *United States v. Young*, 2022 WL 16829260 (W.D. Penn. November 7, 2022) ("In other words, as the Government contends, and this Court agrees, *Bruen*, *Heller* and *McDonald* dictate that Defendant's alleged conduct does not fall within the scope of the Second Amendment's

23

*Bruen*'s references to "ordinary, law-abiding citizens" and posits that all non-law-abiding citizens—"i.e., criminals"—are categorically excluded from Second Amendment protections.[148]

Another approach is a rights-based analysis, asserting that "all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right."[149] This theory draws comparisons to the First, Fourth, Ninth, and Tenth Amendments, under which certain groups of people, including felons, retain vested constitutional rights.[150] This approach also finds support in *Heller*, which identifies "the people" as "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[151]

Roberts argues under this rights-based approach that the Second Amendment applies to all people rather than a particular "subset," and that he is a "member of the political community" protected by the Second Amendment.[152] However, as noted in then-Judge Barrett's dissent in *Kanter v. Barr*,[153] "these approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away."[154]

---

protections due to his felony drug convictions."); *United States v. Riley*, 635 F.Supp.3d 411, 424 (E.D. Va. Oct. 13, 2022) ("A plain reading of the text demonstrates that 'the people' remains limited to those within the political community and not those classified as felons.")

[148] *See Padgett*, 2023 WL 2986935, at *5–6.

[149] *Kanter*, 919 F.3d at 452 (J. Barrett, dissenting) (internal citations omitted).

[150] *See, e.g.*, *Entler v. Gregoire*, 872 F.3d 1031, 1043 (9th Cir. 2017) (affirming that the First Amendment protects the filing of criminal complaints by convicted felons); *United States v. Lara*, 815 F.3d 605, 609 (9th Cir. 2016) (affirming that the Fourth Amendment protects convicted felons against unreasonable searches and seizures).

[151] *Heller*, 554 U.S. at 580–81.

[152] Dkt. 29 at 14.

[153] 919 F.3d 437, 452 (7th Cir. 2019) (J. Barrett, dissenting), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111 (2022).

[154] *Id.*

The Ninth Circuit has not adopted a specific approach post-*Bruen*,[155] and only one district court outside the Ninth Circuit has ruled on whether Second Amendment protections apply to criminal mischief felons in the context of § 922(g)(1).[156] However, several district courts within the Ninth Circuit have followed the categorical-exclusion approach, interpreting *Bruen*'s "law-abiding" provisos to mean that certain groups of non-law-abiding people, regardless of their underlying convictions, are not part of "the people" protected by the Second Amendment.[157]

---

[155] *See United States v. Vongxay* (acknowledging that while "most scholars of the Second Amendment agree that the right to bear arms was inextricably . . . tied to the concept of a virtuous citizen[ry] that would protect society through defensive use of arms against criminals, oppressive officials, and foreign enemies alike, and that the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)," this "historical question has not been definitively resolved" (internal quotations omitted)); *see also United States v. Padgett*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 2986935, at *7 (D. Alaska Apr. 18, 2023).

[156] *See United States v. Sternquist*, No. 22-CR-473(DLI), 2023 WL 6066076, at *1 (E.D.N.Y. Sept. 15, 2023) (upholding § 922(g)(1) both on its face and as applied, and reasoning that "*Bruen* did not disturb and, if anything, endorsed prior Supreme Court dicta assuring the validity of 'longstanding prohibitions' of felon firearm possession").

[157] *See, e.g.*, *United States v. Robinson*, No. 2:22-CR-00212-TL, 2023 WL 5634712, at *4 (W.D. Wash. Aug. 31, 2023) (observing that district courts in the Ninth Circuit have "h[eld] that § 922(g)(1) survives a *Bruen* challenge as applied to persons with non-violent felony convictions, and other courts have suggested they would uphold the statute even under a fresh historical analysis"); *United States v. Guthery*, No. 2:22-CR-00173-KJM, 2023 WL 2696824, at *4 (E.D. Cal. Mar. 29, 2023) (reiterating the Ninth Circuit's opinion in *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016), that "felons are categorically different from individuals who have the right to bear arms"); *U.S.A. v. Ramos*, No. 2:21-CR-00395-RGK-1, 2022 WL 17491967, at *3 (C.D. Cal. Aug. 5, 2022) ("It thus appears that the Supreme Court has no qualms about a statute that withholds firearms from those who do not obey the law—even if they are non-violent— because those individuals are not part of "the people" protected by the Second Amendment. Accordingly, the Court has serious doubts that the plain text of the Amendment applies to Defendant, and could find Section 922(g)(1) constitutional on those grounds alone."); *United States v. Butts*, 637 F. Supp. 3d 1134, 1137 (D. Mont. 2022) (noting that the *Heller* "[c]ourt recognized that certain individuals may be 'disqualified from the exercise of Second Amendment rights'"); *see also* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 1, 18 (forthcoming 2023) ("We would not be surprised, however, if some courts simply exclude domestic violence misdemeanants at *Bruen*'s step one, which some courts have already done for felons and unlawful immigrants—treating them as outside 'the people' covered by the plain text."); *United States v. Padgett*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 3483929, at *5 (D. Alaska Jan. 4, 2023), *report and recommendation adopted*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 2986935 (D. Alaska Apr. 18, 2023) (noting that "[c]ases

Further, this Court has previously considered the argument that both felons and domestic violence misdemeanants, as people who were "neither law-abiding or responsible," are not of "the people" *Bruen* contemplated to be protected by the Second Amendment.[158]

Given these disparate approaches to determining whether an individual's conduct is plainly covered by the Second Amendment, the Court assumes that the Second Amendment's plain text covers Roberts' conduct, and proceeds to analyze whether the Government has carried its burden to show that § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation.

2. Section 922(g)(1) Is Consistent with This Nation's Historical Tradition of Firearm Regulation.

Even if the Second Amendment's plain text presumptively protects Roberts' conduct, the Court concludes the Government satisfied its burden in demonstrating that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation."[159]

If an individual's conduct is covered by the Second Amendment's plain text, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."[160] To do this, this Court must engage in analogical reasoning; it must compare a historical regulation to a modern firearm regulation to determine if the two are "relevantly similar."[161] This only requires the Government to "identify a well-established and representative historical *analogue*, not a historical *twin*. . . . [E]ven if a modern-day regulation is

---

interpreting *Bruen* in the context of § 922(g)(1) have held that 'the people' do not include those convicted of felonies").

[158] *See Padgett*, 2023 WL 3483929, at *5 (citing case law excluding felons from "the people" and advancing a similar justification to exclude domestic violence misdemeanants from the Second Amendment's protections).

[159] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111, 2130 (2022).

[160] *Id.* at 2131.

[161] *Id.* at 2132 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)).

26

not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[162] If a historical regulation imposed a similar "burden [on] a law-abiding citizen's right to armed self-defense" as a modern regulation and had a similar justification, it is a proper historical analogue.[163] To assist courts in identifying unconstitutional regulations, *Bruen* directed lower courts to consider: (1) the lack of a "distinctly similar historical regulation addressing" a "general societal problem" that has existed since the 18th century; (2) historical attempts to address the problem but through "materially different means"; and (3) rejection of or failure to enact "analogous regulations" to control this problem based on constitutional grounds.[164]

To identify relevant historical analogues under *Bruen*, the Court must examine "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[165] Section 922(g)(1) was enacted as part of the Gun Control Act of 1968,[166] which sought to "keep firearms away" from groups of people Congress deemed "potentially irresponsible and dangerous."[167] Congress declared that the purpose of the Act was to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence" and clarified that it did not seek to "discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes."[168] In a Senate Report, Congress further noted that allowing criminals access to firearms was "contrary to the public interest" and of "serious national concern"

---

[162] *Id.* at 2133.

[163] *Id.*; *see id.* ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense *and whether that burden is comparably justified* are 'central' considerations when engaging in an analogical inquiry." (quoting *McDonald v. Chicago*, 561 U.S. 742, 767 (2010))).

[164] *Id.* at 2131.

[165] *Id.* at 2133.

[166] 18 U.S.C. §§ 921–934.

[167] *Huddleston v. United States*, 415 U.S. 814, 828 (1974) (quoting 114 CONG. REC. 21784 (1968) (statement of Rep. Emanuel Celler)).

[168] Pub. L. No. 900618, § 101, 82 Stat. 1213.

warranting protective legislation.[169] Thus, § 922(g)(1) addressed a "general societal problem"—the increasing availability of firearms to convicted criminals—and it purported to burden the right to self-defense by prohibiting such access. *Bruen* instructs that historical analogues to § 922(g)(1) must be identified using these same "how and why" criteria.[170]

The Court determines that the Government carried its burden in demonstrating that § 922(g)(1) is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[171] The Government proffers several historical analogues to § 922(g)(1), including: (1) Catholic disarmament laws;[172] (2) nascent state loyalty laws;[173] (3) disarmament of those "deemed to be dangerous or untrustworthy, such as those unwilling to swear an oath of allegiance to the colonies or the states, slaves, freed blacks, and Native Americans";[174] (4) disarmament of felons, fugitives, drug addicts, and the mentally ill;[175] and (5) civil forfeiture laws.[176] In each of

---

[169] S. Rep. No. 90-1501, at 22 (1968); *see United States v. Yancey*, 621 F.3d 681, 683 ("Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people."); *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous.").

[170] *Bruen*, 142 S. Ct. at 2133.

[171] *Id.* at 2127.

[172] Dkt. 40 at 14 (citing English and American colonial laws that "disarm[ed] classes of people who were deemed to pose a threat to the rule of law, including Catholics").

[173] *Id*. at 15–16 (citing early Pennsylvania and Virginia loyalty oath statutes, which disarmed adult male inhabitants who "refused to swear their allegiance and fidelity to the state[s]").

[174] *Id.* (citing *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) (listing scholarly pieces recognizing the authority of Revolutionary Era state and federal governments to "confiscate weapons from anyone deemed untrustworthy" and that "various jurisdictions . . . have forbidd[en] suspect groups from having arms") (internal quotations omitted))).

[175] *Id.* at 18 (citing to Second Amendment precursors and state laws disarming convicted criminals, and noting that "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds" (quoting Thomas M. Cooley, A TREATISE ON CONSTITUTIONAL LIMITATIONS 40 (Boston, Little Brown & Co. 1890))).

[176] *Id.* at 18–19 (citing historical laws impacting other civic rights forfeited upon criminal conviction).

these examples, Parliament or early state legislatures "disarmed groups from possessing firearms on the basis that they were determined to pose a greater danger to the public or otherwise defied the rule of law."[177] Like § 922(g)(1), these early regulations sought to protect the general populace from the misuse of firearms by high-risk individuals, including criminals, and burdened the right to bear arms by prohibiting access. Thus, they are appropriate historical analogues to § 922(g)(1).

Guided by the *Bruen* court's focus on "founding-era historical precedent,"[178] the Court considers pre-Revolutionary and Founding Era congressional testimony on the scope of the Second Amendment and its precursors especially persuasive.[179] Pre-Revolutionary legal scholars have noted that disarming criminals and those who "have no[] . . . [i]nterest in preserving the public[] [p]eace" was integral to the functioning of a well-regulated republic society.[180] In *Heller*, the Court identified a "highly influential . . . proposal" for amending the Constitution to include a right to bear arms drafted by the 1787 Pennsylvania delegation—a "precursor" to the Second

---

[177] Dkt. 40 at 14.

[178] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111, 2132 (2022) (commending *Heller* for its consideration of "founding-era historical precedent," which "exemplifie[d] [the] kind of straightforward historical inquiry" the *Bruen* court sought to adopt). The *Bruen* court also considered historical precedent from "before, during, and even after the founding" to determine whether there was a "comparable tradition of regulation" to the New York handgun regulation. *Id.* at 2132. Thus, courts are not foreclosed from considering regulations from a variety of timepoints. But the Court expressed skepticism about the probative value of regulations with "temporal distance from the founding," such as those from "roughly a century before the founding" and "late-19th-century laws," which "shed little light on how to properly interpret the Second Amendment." *Id.* at 2144, 2154.

[179] *See* Dkt. 40 at 16–17.

[180] *See U.S.A. v. Ramos*, No. 2:21-CR-00395-RGK-1, 2022 WL 17491967, at *4 (C.D. Cal. Aug. 5, 2022) (quoting John Trenchard & Walter Moyle, *An Argument Shewing, That a Standing Army is Inconsistent with a Free Government, and Absolutely Destructive to the Constitution of the English Monarchy* 7 (1697))); *see also* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506–08 (2004) ("The law demonstrates that in a well-regulated society, the state could disarm those it deemed likely to disrupt society.").

Amendment.[181] The proposed language posited "no law shall be passed for disarming the people . . . *unless for crimes committed*, or real danger of public injury from individuals."[182] While the Founders did not include this provision in the Second Amendment, scholars have noted this is because the legislative authority to exclude criminals from the right to keep and bear arms "was implicitly understood."[183] Moreover, in *United States v. Skoien*,[184] the Seventh Circuit noted that in the Founding Era, "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime."[185] Even if the Founding Era does not offer a precise "historical twin," these "representative historical analogues" reveal a consistent tradition of keeping firearms out of the hands of criminals and other individuals "deemed likely to disrupt society."[186]

---

[181] *District of Columbia v. Heller*, 554 U.S. 570, 604 (2008).

[182] *Id.* at 658 (Stevens, J., dissenting); *see id.* at 625 (noting that the federal government "did not significantly regulate the possession of firearms by *law-abiding* citizens" (emphasis added)).

[183] *Ramos*, 2022 WL 17491967, at *4 (quoting STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT 273 (2008)).

[184] 614 F.3d 638 (7th Cir. 2010).

[185] *Id.* at 640 (citing STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT 273 (2008)).

[186] *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506–08 (2004); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010); *Ramos*, 2022 WL 17491967, at *5 (finding that, "even if the Founding Era provides no historical twin to Section 922(g)(1), there are an abundance of representative historical analogue[s]" to suggest § 922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation"); *United States v. Collette*, 630 F. Supp. 3d 841, 850 (W.D. Tex. 2022) ("[T]his Nation has a historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and power of 'the people[.]'"); *United States v. Nutter*, 624 F. Supp. 3d 636, 645 (S.D.W. Va. 2022) ("Nothing in the historical record suggests a popular understanding of the Second Amendment at the time of the founding that extended to preserving gun rights for groups who pose a particular risk of using firearms against innocent people."); Thomas M. Cooley, A TREATISE ON CONSTITUTIONAL LIMITATIONS 40 (Boston, Little Brown & Co. 1890))) ("Certain classes have been almost universally excluded [from the right to keep and bear arms]—the idiot, the lunatic, and the felon, on obvious grounds."); *see also United States v. Padgett*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 3483929, at *6 (D. Alaska Jan. 4, 2023), *report and recommendation adopted*, No. 3:21-CR-00107-TMB-KFR, 2023 WL 2986935 (D. Alaska Apr. 18, 2023) ("The Court finds that the government has met its burden and demonstrated that § 922(g)(9) is consistent with this Nation's historical tradition of firearm regulation.").

The Government further observes there is a "robust historical tradition of forfeiting several important rights" when an individual commits a crime, such as the right to vote, serve on a jury, and hold public office.[187] While such regulations are not a precise historical analogue to § 922(g)(1), they lend insight into how Congress and state legislatures historically have forced individuals to forfeit other fundamental rights "as a legitimate consequence of a felony conviction."[188] Based on this evidence, the Court concludes that § 922(g)(1) is constitutional as applied to Roberts because it is "consistent with the Nation's historical tradition of firearm regulation."[189] The Court determines that the Government carried its burden in demonstrating that § 922(g)(1) is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[190]

3. <u>Roberts' Argument That There Is No American Historical Tradition Prohibiting Firearm Possession by Felons Is Unpersuasive.</u>

Roberts argues that § 922(g)(1) is unconstitutional as applied to him because there is no "robust tradition of distinctly similar historical regulation[s]" addressing convicted criminals' access to firearms.[191] Roberts asserts: (1) there is no historical analogue to § 922(g)(1) that "permanently disarm[s] citizens based on criminal history prior to the 20th century"; (2) such a regulation does not comport with colonial and Founding Era history; (3) there is no tradition of disarming "unvirtuous" citizens; and (4) and early American disarmament laws are too attenuated to support § 922(g)(1).[192] The Court is not persuaded by Roberts' arguments.

---

[187] Dkt. 40 at 18.
[188] *Id.* at 18.
[189] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111, 2130 (2022).
[190] *Id.* at 2127.
[191] Dkt. 29 at 17.
[192] *Id.* at 17–31.

While Roberts correctly notes that § 922(g)(1) and its immediate precursors only arose in the twentieth century,[193] the historical record indicates that representative *analogues* to § 922(g)(1)—such as those discussed by the Government—arose much earlier, including during the Founding Era.[194] As illustrated by early debates and attitudes to firearm regulation during the drafting of the Second Amendment, as well as nascent state laws barring the use of firearms by criminals, there appears to be a strong tradition of such firearm regulation in the colonial and Founding Eras.[195] Early regulations and binding Supreme Court and Ninth Circuit jurisprudence also reveal that the Second Amendment is intrinsically tied to the idea of a "virtuous" citizenry, whereby only "law-abiding" or "peaceable" citizens have the right to keep and bear arms.[196]

Roberts further observes that certain laws placed temporal limits on criminal firearm bans, and contends that such limits indicate earlier generations addressed the problem of firearm misuse

---

[193] *Id.* at 17 (noting that the 1938 National Firearms Act prohibited possession of firearms by persons convicted of certain felonies).

[194] *See* Dkt. 40 at 13–19 (citing 1 W. & M., Sess. 1, c. 15, in 6 The Statutes of the Realm 71-73 (1688) (disarming Catholics); 1 W. & M., Sess. 2, c. 2, in 6 The Statutes of the Realm 143 (1688) (disarming Catholics, but granting Protestants a right to bear arms); Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership*, 1607–1794, 16 LAW & HIST. REV. 567, 574 (1998) (discussing Maryland, Virginia, and Pennsylvania colonial-era laws disarming Catholics during the Seven Years' War); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 263 (2020) (same); Act of June 13, 1777, § 1 (1777), 9 The Statutes at Large of Pennsylvania from 1652–1801 110, 111–113 (William Stanley Ray ed., 1903) (disarming Pennsylvania colonial-era laws who refused to swear loyalty to the commonwealth); An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurance of Allegiances to the Same, and for Other Purposes ch. III (1777), 9 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619 281, 281 (William W. Hening ed., 1821) (disarming Virginia inhabitants who refused to swear loyalty to the State); Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents (Second Amendment precursor noting that "citizens have a personal right to bear arms unless for crimes committed").

[195] *See id.*

[196] *See U.S.A. v. Ramos*, No. 2:21-CR-00395-RGK-1, 2022 WL 17491967, at *4 (C.D. Cal. Aug. 5, 2022); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010).

through "materially different means" rather than a "categorical, lifetime ban" on firearm possession.[197] He points to two instances in which such bans were not enacted to suggest a general pattern of legislatures rejecting firearm regulation.[198] While not every State enacted disarmament statutes, Roberts' arguments dismiss numerous nascent state firearm bans on criminals and other groups deemed a threat to public safety. As Roberts acknowledges, "at various times, the United States regulated . . . firearm possession by those feared to be violent."[199] Roberts also sidesteps *Bruen*'s instruction to identify historical analogues to modern regulations based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense,"[200] and focuses instead on how early regulations are "dissimilar" from § 922(g)(1).[201] But the Government need only offer evidence of a "well-established and representative historical *analogue*, not a historical *twin*."[202]

Moreover, early American disarmament laws barring certain groups, including felons and other classes of people deemed dangerous or untrustworthy, are not too attenuated to lend historical analogical support for § 922(g)(1). Rather, these laws are "distinctly similar" to § 922(g)(1) in "how and why" they burden an individual's right to armed self-defense; like § 922(g)(1), they sought to safeguard public safety by limiting access to firearms by persons perceived to be a threat to society. While both Roberts and the Government correctly observe that many pre-Revolutionary and early American disarmament laws were biased by racial animus and remain unquestionably problematic,[203] these laws share a core legislative purpose with § 922(g)(1). And, as the Court has previously explained, governments "may restrict firearm possession to groups viewed as

---

[197] Dkt. 29 at 29–30.
[198] *Id.* at 30.
[199] *Id.*
[200] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111, 2133 (2022).
[201] Dkt. 29 at 30.
[202] *Bruen*, 142 S. Ct. at 2133.
[203] Dkt. 29 at 26–28; Dkt. 40 at 18.

dangerous in modern times, not only to those viewed as dangerous in 1791."[204] Here, the colonial, pre-Revolutionary, and early American historical practice of felon disarmament demonstrates that people who committed crimes were viewed as dangerous in the late-eighteenth century. Thus, § 922(g)(1) is consistent with this Nation's well-established historical tradition of "banning dangerous people from possessing guns."[205] In so holding, the Court follows every other district court in the Ninth Circuit, including the District of Alaska, in finding § 922(g)(1) constitutional under *Bruen*'s historical framework.

## IV. CONCLUSION

The Court concludes that 18 U.S.C. §§ 922(g)(1) and 924(a)(2) criminalizing the possession of firearms by felons are not unconstitutional as applied to Roberts, and his conduct falls outside of the scope of the Second Amendment's protections. Accordingly, the Court **DENIES** the Motion.


IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 4th day of January, 2024.

/s/     *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[204] *United States v. Padgett*, No. 3:21-cr-00107-TMB-KFR, 2023 WL 2987935, at *9 (D. Alaska Apr. 18, 2023).
[205] *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019) (J. Barrett, dissenting), *abrogated by Bruen*, 142 S. Ct. 2111.

34